UNITED STATES, Appellee,

v.

Gary K. TIPTON, Machinist's Mate Second Class U.S. Navy, Appellant.

No. 51878.
NMCM 84–2382.

U.S. Court of Military Appeals.

March 2, 1987.

For Appellant: *Lieutenant Commander James J. Quigley,* JAGC, USN (argued); *Lieutenant Commander Frederick N. Ottie,* JAGC, USN (on brief); *Lieutenant Commander Harold M. Shaw,* JAGC, USN.

For Appellee: *Captain Frank F. Krider,* USMC (argued); *Captain Carl H. Horst,* JAGC, USN and *Lieutenant Commander John B. Holt,* JAGC, USN (on brief); *Captain W.J. Hughes,* JAGC, USN.

*Opinion of the Court*

EVERETT, Chief Judge:

Machinist's Mate Second Class Gary K. Tipton was tried by a general court-martial with officer and enlisted members. Contrary to his pleas, he was found guilty of making a false official statement on a dependency application; larceny of temporary lodging allowances and dislocation allowances; submitting a false claim for overseas allowances for four dependents; and 19 instances of obtaining various benefits [1] from the Navy by falsely representing that he was lawfully married to Shirley M. Heckard and that she and her three children were his lawful dependents. These offenses were alleged as violations of Articles 107, 121, 132, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 907, 921, 932, and 934, respectively. He was sentenced to a bad-conduct discharge, confinement for 1 year, total forfeitures, and reduction to the grade of E-1. After his conviction and sentence were upheld by all intermediate reviewing authorities, we granted review to consider:

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJ-

I

Appellant had submitted to the Navy a marriage certificate, which showed that he and Shirley Heckard Tipton had been "married" in Nevada on February 17, 1980. The Navy had also received a 1978 "divorce decree," which showed that appellant and his "former" wife, Lani Mae Tipton, had been divorced. The two documents, among others, had been provided to the Navy in order for appellant to obtain military benefits for Shirley Heckard Tipton and for her three children, whom he claimed to be his dependents by virtue of his marriage to Shirley.

Trial counsel, however, attempted to prove that appellant knew that his divorce decree from Lani Mai Tipton was false; that he was not legally married to Shirley Heckard Tipton; and that he was not entitled to obtain for her and her children any of the various government benefits—such as medical care, lodging, and identification cards—which they had received as his purported dependents. His principal witness, Lani Mae Tipton, testified that she and appellant had been married to each other since February 12, 1977, and had never been divorced. Although acknowledging that they had not lived together since 1979, Lani Mae claimed that she had never seen any divorce decree purporting to dissolve their marriage, until trial counsel showed her one just prior to appellant's trial in 1984.

Trial counsel offered evidence that the decree—which stated that appellant and Lani Mae Tipton had been divorced on June 9, 1978—had been forged by alteration of a 1976 divorce decree between appellant and

[1]. Specification 1 under Charge V alleged that Petty Officer Tipton obtained, by false pretenses, three "identification and privileges cards" for his claimed wife and stepchildren. Specification 2 under Charge V alleged that by falsely representing that the four individuals who were living with him were his legal dependents, Tipton obtained $4,595.30 worth of

Government housing, this amount being reduced to $4,002.17 in the findings. Specifications 4 through 29 alleged obtaining various medical appointments for Tipton's alleged military dependents, each appointment having the value of $40.00. However, he was acquitted of 10 of these specifications.

an earlier wife, Mary Julita Tipton. Moreover, Lani Mae testified that, while living with appellant, she had seen the 1976 decree in his possession. Finally, a clerk from the Reno County Courthouse in Kansas, where the 1978 divorce proceeding purportedly had taken place, testified that she had searched the court records diligently but had not found a divorce decree between the appellant and Lani Mae Tipton. According to this witness, if such a decree had been granted, it would have been filed there.

During the findings portion of the trial, the Government offered into evidence handwritten letters which appellant had sent to Lani Mae Tipton in May, June, and July of 1982—approximately 4 years after the time of the claimed divorce. However, defense counsel objected to admission of the letters on the ground that they were privileged confidential communications between husband and wife. Trial counsel responded that, since Lani Mae Tipton and appellant had not been living together for several years before the letters were written, no privilege existed. However, the military judge concluded that the letters were privileged because appellant and Lani Mae had not been legally separated. See Mil.R.Evid. 504(b)(1), Manual for Courts-Martial, United States, 1969 (Revised edition). Sustaining the defense objection, he ruled "that the privilege does exist within the stated limits of 504(b)" and that "there is no room for debate under the facts of this case."

The defense presented no evidence prior to findings. However, during the sentencing phase of the trial, appellant offered evidence about his marriage to Shirley Heckard and his relationship with her and her three children. He was portrayed as a good father to the children and as a parent who provided the financial support for the family. The defense also emphasized that appellant had almost 20 years of military service and that he had a great deal at stake because he was nearing retirement.

Appellant himself then related the following unsworn statement:

While being stationed at Mare Island on the USS FLINT, I was fortunate enough to have met my present wife and her children, Brian, Brenda and Michael Heckard. At this time I was in the process of obtaining a divorce from my then-present wife, Lani Mae Tipton. *I was the respondent of what I believed to be a non-contested divorce.* This divorce was being processed through the offices of my ex-wife's attorney. In November of 1979, *I was sent a copy of what I believed to be a legally registered and authentic divorce decree allotting my former wife with the custody of our 1-year old son* and child support for $150 a month. At this time I arranged the payments to be sent as a direct allotment from my pay.

*Believing myself to be a legally single person,* my relationship with my present wife and her family took a serious turn, and we discussed the possibility of making our relation—relationship a permanent thing.

I love Shirley and my children very much. I say "my children" because they not only think of me as their father, but I feel as if I could never live without holding that title and honor to them.

I have done everything within my power to make my present family secure, happy and well-provided for. During my time in San Diego and Hawaii, I have been involved in Little League, soccer, and at present I am the coach of the childrens' soccer team. I am also the player-representative for the Ewa Beach Bobby Sox program.

I have tried to teach the kids the proper codes of life and honesty through example. For this reason, I have tried to the best of my ability to live a life as honest and responsible as I would want them to.

That is why I stand in front of you for the crimes that I have been accused of. I can only say that the real—realization of them I find very hard to accept. I realize my ignorance. I do owe this country restitution for a monetary basis

for services that, in innocence, was received by my family and I. I owe this as a duty to my country and to my family. I would like to make amends, not only to you, but to my family and, as of May 1983, I filed for a genuine divorce decree through the State of Hawaii. When this has been obtained, I will be able to make restitution to my family by gladly remarrying them.

(Emphasis added.)

After appellant had made the unsworn statement, the prosecution reoffered the letters as evidence and contended that appellant

has waived the marital communications privilege in regards to the letters, that ... [he] has brought into issue by his unsworn statement the validity of his reasonable, good-faith belief in the validity of that marriage, and therefore we would submit that ... [the letters] should be admitted in rebuttal.

Defense counsel again objected on the ground that the letters written by appellant to Lani Mae Tipton and Gary Tipton, Jr., were protected from disclosure by the confidential-maritalcommunication privilege under Mil.R.Evid. 504. Furthermore, he asserted that

[i]t has not been waived under the circumstances. That the accused's unsworn statement says clearly in it that he is in the process of obtaining a legal divorce, that there is no good-faith belief exception in the—Rule 504, that, indeed, there's no evidence that contradicts the fact that this Lani Tipton is, indeed, was once and still, indeed, is the spouse of Gary Tipton, and that as further—as related to the Court in his statement that he is in the process of trying to obtain a divorce so that he may remarry, the first marriage being mere ceremony only, as shown by the evidence before this Court and acceded to by Petty Officer Tipton in his statement. That the communication is, indeed, privileged, and there has been no reference made to the relationship with Lani Tipton such that these letters

would be relevant, proper rebuttal and—or possibly a waiver having occurred.

At this point, the military judge overruled the defense objection "based upon the contents of the unsworn statement." He stated that

to permit the privilege to continue to be asserted at this point would (a) not be in accordance with the policy or underlying concepts of the privilege, and (b) in effect would constitute a fraud on the Court.

The essence of the privilege is the belief in a confidential relationship, the right of a person to communicate with their spouse with the confidence that the privilege will be held in confidence if communicated in a confidential manner, whereas here the accused asserts that he believed himself to be single and not married to the respondent, no public policy can be served by the permission—or by the continuation of a privilege under such circumstances.

Further, the unsworn statement may be viewed as an implicit waiver—indeed, arguably explicit waiver—of that privilege. The honoring of the privilege at this point would permit the accused in effect to claim that he was lawfully married to two persons, which, as a matter of law, cannot be.

Thereafter, defense counsel contended that the letters also were inadmissible because they were irrelevant and did not constitute proper rebuttal. Finally, he interposed an objection to the exhibits on the ground of authenticity. However, the military judge merely reaffirmed his earlier ruling admitting the letters in evidence. On appeal, the Court of Military Review summarily upheld appellant's conviction and stated that "[w]e find neither error nor abuse of discretion in the evidentiary rulings and sentencing instructions which appellant challenges in this appeal." Unpublished opinion at 1.

## II

Appellant continues to insist that disclosure of the letters written to his wife, Lani Mae Tipton, was barred by the husband-

wife privilege under Mil.R.Evid. 504(b), which states:

(1) *General rule privilege.* A person has a privilege during and after the marital relationship to refuse to disclose, and to prevent another from disclosing, any confidential communication made to the spouse of the person while they were husband and wife and not separated as provided by law.

(2) *Definition.* A communication is "confidential" if made privately by any person to the spouse of the person and is not intended to be disclosed to third persons other than those reasonably necessary for transmission of the communication.

## A

We recognize that the case law provides some support for the Government's contention at trial that persons who have been separated for several years—as appellant and Lani Mae Tipton had been—fall outside the contemplation of the marital privilege for confidential communication. For example, in *United States v. Byrd,* 750 F.2d 585 (7th Cir. 1984), the Court of Appeals reasoned:

The purpose of the communications privilege, which is to promote marriage as a haven for confidential communications, is a valid one. The "solace" provided by a feeling of security in marital confidences is as important in today's world as it has always been. Reason and experience guide us in concluding, however, that while it is in the interests of society for courts to protect the confidentiality of the marriage relationship, there is little societal interest in protecting the confidential relationship of permanently separated couples. The importance of the search for truth at issue in a criminal trial outweighs the interest in protecting separated couples' confidentiality. We agree with some commentators that the privilege probably only weakly serves the purpose for which it exists, in that few couples presumably know of this privilege or rely on it when making marital confidences. *See* Note, *supra,* 56 Ind. L.J. at 132–35. *See also* Hutchins & Slesinger, *Some Observations on the Law of Evidence: Family Relations,* 13 Minn. L.Rev. 675, 677 (1929). We agree, too, that the privilege may rest on the courts' desire to avoid "the naturally repugnant" sight of a spouse revealing marital confidences on the witness stand. Protecting the truth-seeking function of a trial should not be outweighed by oversensitivity to "embarrassing" testimony, however. C. McCormick, Handbook of The Law of Evidence, Section 86 (2d ed. E. Cleary 1972). Additionally, holding that permanent separation at the time of the communications negates the privilege does not impose on trial courts the heavy fact-finding burden that would have been imposed on the courts had we held that marital deterioration alone destroys the privilege.

We refuse to extend the communications privilege to permanently separated couples on the theory that a guaranteed protection of confidentiality at this stage might save some troubled marriages. *Cf. Appeal of Malfitano,* 633 F.2d 276, 278 (3d Cir. 1980) (declined to uphold "joint participants in a crime" exception to the testimonial privilege on the theory that the protection of the privilege may tend "to help future integration of the spouse back into society"). Such a purpose is too speculative to justify a privilege that can severely hamper the truth-finding process essential to a criminal trial.

750 F.2d at 592–93 (footnotes omitted).

We note, however, that appellant's letters seem to have been written with a view to obtaining a resumption of his marital relationship with Lani Mae. Thus, to view these parties as permanently separated at the time of the confidential communications is not completely accurate. Indeed, the policy upholding the marital privilege would seem to encompass letters written to promote reconciliation with an estranged spouse.

Furthermore, an appellate court which, as in *United States v. Byrd,* supra, is applying the Federal Rules of Evidence occupies a quite different position from a court applying the Military Rules of Evidence. The Federal Rules do not codify the privileges available in trials in the Federal District Courts. Instead, as to criminal trials, they only state that privileges "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience." Fed.R.Evid. 501.[2] *Cf. Funk v. United States,* 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369 (1933); *Wolfle v. United States,* 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617 (1934); *United States v. Allery,* 526 F.2d 1362, 1364 (8th Cir. 1975). Therefore, in dealing with the marital privilege, a judge of a Federal District Court or Court of Appeals has the responsibility of examining the policies that gave rise to this privilege at common law and to determine whether "reason" or "experience" sustain invocation of the privilege in a particular case. *See, e.g., United States v. Brown,* 605 F.2d 389 (8th Cir. 1979); *United States v. Cameron,* 556 F.2d 752 (5th Cir. 1977).

On the other hand, the Military Rules of Evidence deal specifically with various privileges. Thus, some commentators[3] have observed that

[t]he Committee deemed the approach taken by Congress in the Federal Rules impracticable within the armed forces. Unlike the Article III court system, which is conducted almost entirely by attorneys functioning in conjunction with permanent courts in fixed locations, the military criminal legal system is characterized by its dependence upon large numbers of laymen, temporary courts, and inherent geographical and personnel instability due to the worldwide deployment of military personnel. Consequently, military law requires far more stability than civilian law. This is particularly true because of the significant number of non-lawyers involved in the military criminal legal system. Commanders, convening authorities, non-lawyer investigating officers, summary court-martial officers, or law enforcement personnel need specific guidance as to what material is privileged and what is not.

Section V combines the flexible approach taken by Congress with respect to privileges with that provided in the present Manual. Rules 502–509 set forth specific rules of privilege to provide the certainty and stability necessary for military justice.

■ As we read Mil.R.Evid. 504(b)(1), the reference to spouses "not separated as provided by law" was intended to give specific guidance to those who would be applying the Rule. This language contemplates some type of legally recognized separation—such as separation under a separation agreement or pursuant to an interlocutory or final divorce decree.[4] Physical separation alone does not suffice, even if it is lengthy and with the intent never to resume cohabitation. Setting forth this clear test provides "the certainty and stability necessary for military justice." *See* n. 3, *supra.*

■ Thus, in determining whether a martial-confidential-communications privilege exists, the judge need only inquire whether there has been some type of legally recognized separation and need not consider whether or how long the parties have lived apart or what their intent was for the

---

**2.** This language is almost identical to that of Fed.R.Crim.P. 26 before its amendment after the Federal Rules of Evidence were promulgated. Thus, in practical effect the treatment of marital privilege in Federal criminal trials was not affected by the Federal Rules of Evidence. In line with *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), State law supplies the rule as to privilege in civil actions "as to which State law supplies the rule of decision." *See* Fed.R.Evid. 501.

**3.** S. Saltzburg, L. Schinasi, and D. Schlueter, *Military Rules of Evidence Manual* 215 (1981).

**4.** Typically a document of some sort is necessary for a legal separation; and verbal agreements to separate are usually given little effect in family law. The written agreement serves both evidentiary and cautionary functions.

future.[5] So long as a married couple has not been "separated as provided by law," the confidential communication is privileged—no matter how disharmonious their marital relationship may have been at the time of the communication. Of course, the privilege as to any confidential communication made while the parties were married continues even after they have been separated or divorced, so long as the separation or divorce did not precede the making of the communication. *See, e.g., United States v. Lilley*, 581 F.2d 182, 189 (8th Cir. 1978); *United States v. Allery, supra* at 1365; *United States v. Fisher*, 518 F.2d 836, 838 n. 2 (2d Cir. 1975).

## B

■ The Government also asserts that, even if the letters were properly excluded prior to findings, they were admissible during the sentencing proceedings. In this connection, it emphasizes that rules of evidence are relaxed in connection with sentencing—especially for purposes of rebuttal, *see* para. 75(d), *Manual, supra*. Thus, evidence inadmissible in aggravation may be admissible in rebuttal. *See, e.g., United States v. Strong*, 17 M.J. 263 (C.M.A. 1984). However, we can see no reason why the policy behind recognition of a husband-wife privilege would cease to operate after a finding of guilty has been returned. Moreover, we find nothing in the language of Mil.R.Evid. 504—or, indeed elsewhere in Section V of the Military Rules of Evidence or in the Manual for Courts-Martial—which contemplates that a privilege available to the accused prior to findings will be less available to him thereafter during the sentencing proceedings. Indeed, Mil.R.Evid. 1101(b) expressly prescribes that "[t]he rules with respect to privileges in Sections III and V apply at all stages of all actions, cases, and proceedings." Thus, the Government's assertion is without foundation.

## C

Finally, the Government relies on the rationale which induced the military judge to admit the letters into evidence. The logic here is that, since, according to his unsworn statement, appellant believed himself to be divorced from Lani Mae Tipton at the time of the letters, he cannot have believed that the letters were privileged confidential communications when they were mailed to her.

■ There are defects in this position. In the first place, Mil.R.Evid. 504, although recognizing certain exceptions to the marital privilege, *see* 504(c), contains no exception that matches the facts here. Secondly, if parties are lawfully married and one makes a confidential communication to another, then under the literal wording of the Rule, the privilege exists whether or not the party making the communication was even aware that the relationship existed. Thus, someone who had entered into a common-law marriage with another person apparently would be entitled to the benefits of the privilege with respect to a confidential communication, even if he was unaware that the marital relationship had been established. By the same token, the privilege would exist even if one spouse had the erroneous belief that he had been divorced from the other.

Furthermore, if there is any inconsistency between the appellant's unsworn statement that he believed that he had been divorced from Lani Mae Tipton and his claim of marital privilege with respect to a confidential communication made to her, this inconsistency is no greater than that implicit in the Government's convicting appellant on the premise that he was married to Lani Mae and at the same time claiming

---

5. Under the law of many States, if the parties have separated pursuant to a separation agreement but have then resumed cohabitation, the separation agreement is void. Thus, continued physical separation may be relevant, even though there has been some type of separation agreement entered into between the husband and wife. The law to be applied in determining whether the husband and wife were legally separated for purposes of Mil.R.Evid. 504(b)(1) would seem to be the law of the State where the parties were domiciled.

that he was not entitled to the marital privilege with respect to his confidential communications to her.

## D

If, however, we had any doubt that the letters were confidential communications, there was still another reason for excluding them. Trial counsel introduced the letters as "rebutting" evidence because, according to counsel for the United States before us, they "arguably belie appellant's assertion of his good-faith belief in a legal marriage to Shirley Heckard."[6] However, instead of rebutting appellant, the letters tended to corroborate his claim that he had honestly believed that he was divorced from her. For example, in the third letter to her (June 25' 82), he had stated specifically that he *"would* remarry you when you came back." (Emphasis added.) Other letters indicated that he wanted very much to be back with her and with his son, Gary Tipton, Jr. Nothing in the letters seems inconsistent with his having believed that he had obtained a valid divorce from Lani Mae.

■ Perhaps appellant's desire to rejoin Lani Mae Tipton and his son does not fit well with his portrayal to the court as a good husband to Shirley Heckard and a good stepfather to her children. However, this inconsistency, if it exists, was not relied on in any way by trial counsel in his effort to secure admission of the documents. Thus, even if otherwise admissible, the letters should have been excluded because they did not conform to the prosecutor's avowed purpose of rebutting appellant's unsworn statement.

## III

Since appellant did not receive a harsh sentence, there is some temptation to view the introduction of these contested exhibits as harmless error. However, Tipton of-

6. Of course, at this point in the trial, the need for this rebuttal evidence is hard to perceive, since in convicting appellant the court members already had determined that he had known that

fered some impressive extenuation and mitigation evidence; and apparently he had rendered many years of creditable military service. Moreover, it seems clear from the contents of the letters themselves and from trial counsel's insistence—both prior to findings and then during the sentencing proceedings—on their admission into evidence, that the Government believed that the letters gave a very demeaning picture of appellant. For example, in some of the letters appellant appeared preoccupied with resuming sexual relations with Lani Mae; and in one letter he suggested an exchange of pictures showing each of them in the nude.

■ An accused is not entitled to immunity from the Government's introduction of unflattering evidence—especially during sentencing proceedings. However, in this case, the evidence should not have been admitted. In determining whether prejudice resulted, it seems appropriate in this case to rely to some degree on the prosecutor's evaluation of the evidence's likely effect. Clearly this officer, who was representing the Government's interest at the trial, believed that the evidence would have impact on the court members in their deliberations. We certainly are not convinced to the contrary. Accordingly, the only fair course of action is to direct a reassessment of the sentence.

## IV

The decision of the United States Navy-Marine Corps Court of Military Review is reversed as to sentence. The record of trial is returned to the Judge Advocate General of the Navy for remand to that court for reassessment of the sentence.

Judge COX concurs.

Judge SULLIVAN did not participate.

he had never been divorced from Lani Mae Tipton.