**UNITED STATES of America, Appellee,**

v.

**Camille T. LILLEY, Appellant.**

**No. 77–1917.**

United States Court of Appeals,
Eighth Circuit.

Submitted March 13, 1978.

Decided Aug. 9, 1978.

John H. Moosbrugger, Mack, Moosbrugger, Leonard, Ohlsen & Dvorak, Grand Forks, N. D., for appellant.

Gary Annear, Asst. U. S. Atty., Fargo, N. D. (argued), for appellee; James R. Britton, U. S. Atty., Fargo, N. D., on brief.

Before VAN OOSTERHOUT, Senior Circuit Judge, HENLEY, Circuit Judge, and LARSON, Senior District Judge.*

HENLEY, Circuit Judge.

Appellant, Camille T. Lilley, was indicted for obstructing correspondence in violation of 18 U.S.C. § 1702 (Count I), forging an endorsement on a check drawn on the United States Treasury in violation of 18 U.S.C. § 495 (Count II), uttering and publishing as true said forged check in violation of 18 U.S.C. § 495 (Count III), and aiding and abetting each of the above three offenses in violation of 18 U.S.C. § 2. Appellant was tried by jury in the United States District Court for the District of North Dakota. She was found guilty on Counts I and III but not guilty on Count II. From judgments of conviction and concurrent sentences of one year on each count Ms. Lilley appeals.

Appellant and her husband, George L. Lilley, were charged with the offenses listed above as a result of the cashing of a Federal Treasury Check which constituted an income tax refund to Clayton W. Meeks. Mr. Lilley's case was disposed of prior to trial by a plea of guilty to the forgery charge (Count II), dismissal of the other charges against Mr. Lilley and a sentence of probation. At trial appellant contended that her husband intercepted, forged and negotiated the check. The government contended that appellant intercepted the

* The Honorable Earl R. Larson, United States Senior District Judge, District of Minnesota, sitting by designation.

check, aided and abetted the forgery and cashed the check.

On appeal appellant asserts three grounds for reversal. She contends, first, that the admission of the testimony of Agent Buchholz concerning statements made by Mr. Lilley to the Agent and subsequently related by the Agent to appellant violated the marital privilege and also that the testimony constituted hearsay; second, that it was improper for the trial court to allow Mr. Lilley to testify over appellant's objection that such testimony violated appellant's marital privilege; and, third, that the evidence was insufficient to sustain the convictions.

The testimony adduced at trial as relevant to the issues raised on appeal may be summarized as follows. Douglas Buchholz, a Special Agent of the United States Secret Service, testified that he was the case agent in charge of investigating the Meeks check incident. According to Buchholz, on August 24, 1977 he interviewed appellant since Mr. Meeks had noted that appellant and her husband had been residing at the address to which the Meeks check had been sent. Agent Buchholz obtained a handwriting sample from appellant and asked her if she knew anything about the Meeks check. Appellant stated she knew nothing about the check but that she thought her ex-husband, George Lilley, might be involved.[1] Agent Buchholz told appellant the check had been cashed at a music store in Grand Forks and that a guitar had been purchased with it. Appellant responded that Mr. Lilley played the guitar. Later appellant advised the authorities of Mr. Lilley's address.

On September 1, 1977 Agent Buchholz sought out Mr. Lilley, advising Mr. Lilley that he was investigating a forged endorsement on a check belonging to Clayton Meeks. Agent Buchholz testified that Lilley said he had been at the Forx Hotel in Grand Forks, North Dakota, when appellant had brought the Meeks check to him and asked him to sign it, indicating that he would not get in trouble because she was entitled to the money from the check for the support of her child by Mr. Meeks. Mr. Lilley stated appellant took his hand and helped him to write the signature, Clayton Meeks, on the back of the check, and Mr. Lilley and appellant then went to Scott's Music Store where appellant cashed the check. Lilley stated that he had been drinking during these events. Agent Buchholz then arranged a second interview with appellant. He related to appellant the information which Mr. Lilley had given. In response, appellant furnished a written statement saying she wanted to tell Agent Buchholz the way she recalled it happened. Appellant's written statement which was read into evidence was as follows:

In the spring of 1977 I had my mail sent to Pamela Yahola—is how I pronounce it—423 Seward No. 3, Grand Forks, North Dakota. She advised by phone the Clayton Meeks' check was there. I advised her to send it back to Idaho, which wasn't done. When I returned from Jamestown State Hospital, she gave me my mail. This check was not there. George was there—she was referring to George Lilley—had gone through my mail. George came to my place, asked me to help him pick out some rings for Lillian Olson. We had something to drink—and above that, parentheses, has 'whiskey'—which she bought. Then he left—asked me later at McGuire's Bar to assist him in purchasing drinks. He couldn't cash his check so he steered me over to several shops. Then he decided to buy a guitar. Then we departed as I felt I had enough to drink. I never seen George until the next day, approximately 10:00 a.m. As I recall, he signed the check at a music shop. I never received any money of the Clayton Meeks' check.

Mr. Lilley, testifying for the government on rebuttal, related that while he was staying at the Forx Hotel appellant visited him and asked him to sign a check and said it would be all right because she had it com-

Mr. Lilley were married at the time of the interview and at the time of trial.

ing for her child. Mr. Lilley testified he had been drinking heavily and must have signed the check because she (appellant) had his hand on something. Mr. Lilley remembered going to a music store to buy a guitar but could not remember who gave the check to the salesman. He could not remember whose possession the check was in when he and appellant entered the music store, nor did he remember a check being issued at the music store for the difference between the price of the guitar and the amount of the forged check.

Appellant testified on her own behalf as follows. While in the Jamestown alcoholic treatment facility she was advised by her daughter, Pamela Yahola, that an income tax refund check had arrived addressed to Clayton Meeks. Appellant first advised her daughter to put the check back in the mail box but later changed her mind and asked Ms. Yahola to keep the check so the appellant could take it to the Welfare Office and hopefully get some of the proceeds for her child by Mr. Meeks. On April 7, 1977 appellant went to Ms. Yahola's apartment to pick up her mail. Mr. Lilley was at the Yahola residence when appellant arrived. Ms. Yahola gave appellant a large envelope containing appellant's mail, but the Meeks check was not in the envelope. On April 9, 1977 Mr. Lilley came to appellant's apartment and asked appellant to go downtown with him to help him pick out some rings for his girlfriend. Appellant went with Mr. Lilley. Mr. Lilley attempted to cash an income tax refund check at a jewelry store but was unsuccessful. He later tried to cash the same check at a bar but was again unsuccessful. Mr. Lilley and appellant happened to come across a music store and Mr. Lilley suggested that they go in. Mr. Lilley decided to purchase a guitar and took the guitar to the front of the store. Appellant remained toward the back of the store. Mr. Lilley was told the store couldn't cash the Meeks check but that they could take it in payment for the guitar and issue Mr. Lilley a check for the difference which Mr. Lilley could cash at any Piggly Wiggly store. Mr. Lilley endorsed the Meeks check and got a check for $200.00 change from the music store which he put in his pocket. Mr. Lilley carried the guitar as he and appellant left the music store. Appellant never received any part of the proceeds from the $200.00 check. Shortly thereafter appellant began to suspect that the tax refund check cashed by Mr. Lilley had been the Meeks check. Appellant testified she did not take, sign, pass or receive any of the proceeds from the Clayton Meeks check.

We reverse appellant's conviction on both counts.

The testimony of Agent Buchholz concerning appellant's reaction to the agent's recitation of Mr. Lilley's statement incriminating appellant should have been excluded.

Counsel for appellant makes a strong argument that the marital privilege includes a prohibition against a third person relating a statement made by one spouse against the other which that spouse would not be allowed to relate if called as a witness, citing *Peek v. United States,* 321 F.2d 934 (9th Cir. 1963). Even if it be true that the evidence should have been excluded on this ground had a proper objection been made, we have searched the record in vain for an objection to Agent Buchholz's testimony based on marital privilege. Thus, we do not reach the issue of marital privilege as it relates to Agent Buchholz's testimony. However, we hold that the testimony should have been excluded as hearsay, and we note that repeated objections were made on this ground.

It is clear that the testimony of Agent Buchholz concerning statements made by Mr. Lilley to Agent Buchholz and repeated by the agent to appellant fall within the definition of hearsay set out in Fed.R.Evid. 801(c). The government argues that Agent Buchholz's testimony was properly admitted under Fed.R.Evid. 801(d)(2)(B) which provides:

(d) Statements which are not hearsay. A statement is not hearsay if—

(2) Admission by party-opponent. The statement is offered against a party and is (B) a statement of which he has manifested his adoption or belief in its truth . . . . .

It is well established that, as a general rule, when an accusatory statement is made in the defendant's presence and hearing, and he understands it and has an opportunity to deny it, the statement and his failure to deny it are admissible against him. *See United States v. Ojala*, 544 F.2d 940, 946 (8th Cir. 1976); *United States v. Moore*, 522 F.2d 1068 (9th Cir.), *cert. denied*, 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976). The government argues that when Agent Buchholz recited Mr. Lilley's statement implicating appellant to her, appellant adopted the statement as her own. We disagree. The record clearly indicates that in spite of appellant's failure to deny expressly each and every portion of her husband's statement, she did state that she wanted to tell Agent Buchholz the way she recalled the incident. Her written statement, given to Agent Buchholz in response to the agent's recitation of Mr. Lilley's statement, contradicts Mr. Lilley's statement in virtually every material respect. Appellant's written statement implies that Mr. Lilley took the Meeks check from Pamela Yahola's home, thus contradicting Mr. Lilley's statement that appellant brought the check to Mr. Lilley at the Grand Forx Hotel and asked him to sign it. Appellant stated that Mr. Lilley signed the check at a music shop, contradicting Mr. Lilley's statement that appellant had helped him to sign the check at the Grand Forx Hotel. In fact, appellant's entire statement was at odds with Mr. Lilley's statement insofar as it set out the circumstances surrounding the interception, forgery and negotiation of the check. Clearly, appellant did not adopt her husband's statement as true. Her failure to use the words "I deny Mr. Lilley's statement" in no way lessens the effect of her response which constituted an effective denial of the truth of the story told by Mr. Lilley.

The government argues that even if the 801(d) argument is rejected and Agent Buchholz's testimony is found to constitute hearsay, the testimony was properly admitted under Fed.R.Evid. 804(b)(3) as a statement against interest made by an unavailable witness. Fed.R.Evid. 804(a)(1) states:

'Unavailability as a witness' includes situations in which the declarant—

(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement . . . . .

We agree with the government's assertion that Mr. Lilley was unavailable as a witness during its case in chief due to appellant's invocation of the anti-marital facts privilege. However, we reject the government's argument that Mr. Lilley's statement was admissible because it tended to subject him to criminal liability. Fed.R.Evid. 804(b)(3) states:

(3) Statement[s] against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Mr. Lilley's statement was only partially against his interest. While Mr. Lilley did admit to writing Mr. Meeks' name on the check with appellant's help, for the most part his statement was inculpatory of appellant and not against Mr. Lilley's interest. Indeed, Mr. Lilley was the prime suspect in the investigation at the time of his interview with Agent Buchholz, and his statements inculpating appellant were clearly in his interest and likely were made to shift suspicion away from himself and to soften the impact of his admission to signing Mr. Meeks' name on the check. In his statement, Mr. Lilley attempted to foist the blame for the interception, forgery and negotiation of the Meeks check onto his wife, thus exculpating himself, or at least minimizing his criminal liability. Even the portion of Mr. Lilley's statement admitting

that he signed Mr. Meeks' name to the check was only marginally against Mr. Lilley's interest since he claimed to have been drunk at the time, and he also claimed that appellant persuaded him to sign the check and guided his hand while he was signing Mr. Meeks' name.

We turn to the question whether Mr. Lilley's statement may be admitted under the 804(b)(3) exception to the hearsay rule since his statement contained some material which was against his interest and some allegations which were not against his interest and which were inculpatory of the accused.

McCormick sets out three possible methods of handling such evidence:

First, admit the entire declaration because part is disserving and hence by a kind of contagion of truthfulness, all will be trustworthy. Second, compare the strength of the self-serving interest and the disserving interest in making the statement as a whole, and admit it all if the disserving interest preponderates, and exclude it all if the self-serving interest is greater. Third, admit the disserving parts of the declaration, and exclude the self-serving parts. The third solution seems the most realistic method of adjusting admissibility to trustworthiness, where the serving and disserving parts can be severed.

McCormick's Handbook of the Law of Evidence, § 279 (2d Ed.1972).

■ The restriction advocated by McCormick excluding portions of statements which are not against the declarant's interest is in keeping with the reasoning behind the 804(b)(3) exception to the hearsay rule. Rule 804(b)(3) is based on the guaranty of trustworthiness which accompanies a statement against interest. To the extent that a statement is not against the declarant's interest, the guaranty of trustworthiness does not exist and that portion of the statement should be excluded. Those portions of Mr. Lilley's statement inculpating appellant did not so far tend to subject him to criminal liability and were not so far contrary to his interests that a reasonable man would not have made them unless he believed them to be true. Exclusion of portions of statements which were not against the declarant's interest when made and which are inculpatory of the accused is in accord with *United States v. Rogers,* 549 F.2d 490, 498 n.8 (8th Cir.), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977), where this court stated in dicta that use of part of a statement clearly against interest would not cure use of the inculpatory part of the statement if the latter was no longer against the declarant's penal interests when given. *See also People v. Bullard,* 75 Cal.App.3d 764, 142 Cal.Rptr. 473, 477 (1977); 4 Weinstein's Evidence ¶ 804(b)(3)[03] at 804–95; Jefferson, Declarations Against Interest: An Exception to the Hearsay Rule, 58 Harv.L.Rev. 1, 60 (1944). Thus, all portions of Mr. Lilley's statement which were not against his interest should have been excluded from evidence because they lacked the indicia of truthfulness associated with Rule 804(b)(3). Also, the small portion of Mr. Lilley's statement which was against his interest should have been excluded absent severability from those portions of the statement inculpating the accused.

■ Since we cannot say that the introduction of Agent Buchholz's testimony was harmless beyond a reasonable doubt, and since the testimony implicated appellant on both counts of the indictment, the case must be reversed and remanded on both counts for a new trial.

The decision by the district court to allow Mr. Lilley to testify against appellant on rebuttal also requires reversal. Counsel for appellant objected to Mr. Lilley's testimony on the ground that it violated the marital privilege. We agree. The district court ruled against appellant on this issue stating:

. . . I have changed my mind about instructing them, the jury, about George Lilley not testifying. I believe that it has been opened up by the Defendant putting the co-Defendant on the stand and her testifying as to the joint part in the transaction. She has thereby

waived her privilege . . . [T]he purpose of the privilege is to preserve the domestic harmony. When the Defendant gets on the stand and seeks to blame them both, testifies as to the transactions that took place, conversations that took place between her and her husband, then she has waived her privilege.

Fed.R.Evid. 501 provides that the privileges of witnesses shall be governed by the principles of the common law, as they may be interpreted by the courts of the United States. This court has recognized the marital privilege known as the anti-marital facts privilege, which prevents one spouse from testifying against the other absent waiver of the privilege. *See United States v. Allery*, 526 F.2d 1362, 1365 (8th Cir. 1975), and authorities cited therein. We refuse to condition the privilege, as the government would have us do, on a judicial determination that the marriage is a happy or successful one. A thorough search of the record does not disclose any waiver of this privilege by appellant. Counsel for the government cites *People v. Worthington*, 38 Cal.App.3d 359, 113 Cal.Rptr. 322 (1974), in support of the ruling of the district court regarding waiver. *Worthington* dealt with a waiver in the context of a statutory marital confidential communication privilege, and found that the defendant himself had disclosed a significant part of the communication and thus had waived his privilege. *Worthington* is inapposite to the case at bar since it does not deal with the anti-marital facts privilege which was asserted by counsel for appellant and which must be distinguished from the confidential communications privilege.[2] The anti-marital facts privilege embodies the rule that one spouse cannot be a witness against the other absent consent (waiver). The marital confidential communication privilege prohibits testimony concerning intra-spousal confidential communications arising from the marital relationship. The anti-marital facts privilege exists only so long as the parties remain married, and it is an absolute privilege absent waiver by the spouse against whom the testimony is offered.[3] The confidential communication privilege continues even after the parties are no longer married, so long as a confidential communication was made during the marriage. *See United States v. Allery, supra*, and authorities cited therein; *United States v. Lustig*, 555 F.2d 737, 747 (9th Cir.), *cert. denied*, 434 U.S. 1045, 98 S.Ct. 889, 54 L.Ed.2d 795 (1978). The confidential communications privilege is waived, by definition, when the allegedly confidential communication is disclosed by the spouse claiming the privilege because the communications are no longer confidential. The anti-marital facts privilege, on the other hand, does not require confidentiality. We have found no authority in support of the district court's ruling that by taking the stand and testifying that her husband likely intercepted, signed and cashed the Meeks check that appellant waived her anti-marital facts privilege.

Accordingly, the judgment is reversed on both counts and the case remanded for a new trial.

---

2. Various federal court cases cited by counsel for the government are equally inapposite insofar as they deal with the confidential communication privilege.

3. An exception to the privilege exists where one spouse has committed an offense against the other spouse or against a child of either spouse. *See United States v. Allery, supra.*